UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JACOB THOMAS,
      Petitioner,

vs.                               Case No.:  4:19cv366/AW/EMT

MARK S. INCH,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

Petitioner Jacob Thomas (Thomas) filed a petition for writ of habeas corpus under 28 U.S.C. § 2254, and a supporting memorandum (ECF Nos. 1, 8). Respondent (the State) filed an answer and relevant portions of the state court record (ECF No. 21).  The court provided Thomas an opportunity to file a reply (*see* ECF No. 22), but he has not done so as of the date of this Report and Recommendation.

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of the issues presented by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is

further the opinion of the undersigned that the pleadings and attachments before the court show that Thomas is not entitled to habeas relief.

## I.    RELEVANT BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 21).[1]  Thomas was indicted in the Circuit Court in and for Leon County, Florida, Case No. 2012-CF-1395, on one count of first degree premeditated murder (Count I) and one count of possession of a firearm by a convicted felon (Count II) (ECF No. 21-2 at 16 (indictment)).  On April 16, 2014, a jury found Thomas guilty of first degree premeditated murder, with specific findings that Thomas actually possessed a firearm, discharged a firearm, and caused death during the course of the offense (ECF No. 21-2 at 107–08 (verdict), 133–470 (transcript of jury trial)).  After the jury returned its verdict, the court sentenced Thomas to a term of natural life in prison without the possibility of parole, with pre-sentence credit of 715 days (ECF No. 21-2 at 109–17 (judgment and sentence), 470–73 (transcript of sentencing)).[2]

---

[1] Citations to the state court record and the parties' pleadings refer to the document and page numbers assigned by the court's electronic filing system.

[2] The State and the defense agreed to sever the firearm possession charge (*see* ECF No. 21-3 at 11–13).  At the conclusion of Thomas' trial and sentencing, the State nolle prossed the firearm possession charge (ECF No. 21-2 at 472–73).

Thomas appealed the judgment to the Florida First District Court of Appeal (First DCA), Case No. 1D14-1999 (ECF No. 21-2 at 119 (notice of appeal), ECF No. 21-4 (Thomas' initial brief), ECF No. 21-5 (State's answer brief)). The First DCA affirmed the judgment per curiam without written opinion on February 16, 2016 (ECF No. 21-6 at 2 (opinion)). *Thomas v. State*, 185 So. 3d 1239 (Fla. 1st DCA 2016) (Table). The mandate issued March 15, 2016 (ECF No. 21-6 at 4 (mandate)).

On August 5, 2016, Thomas filed a petition for writ of habeas corpus in the First DCA, Case No. 1D16-3611, alleging ineffective assistance of appellate counsel (ECF No. 21-8 (petition)). The First DCA denied the petition on the merits on February 27, 2017 (ECF No. 21-10 (opinion)). *Thomas v. State*, 230 So. 3d 826 (Fla. 1st DCA 2017) (Table).

On August 11, 2016, Thomas filed a motion for post-conviction relief in the state circuit court, under Rule 3.850 of the Florida Rules of Criminal Procedure (ECF No. 21-12 at 5–24 (motion and exhibits)). The State conceded that an evidentiary hearing was necessary (ECF No. 21-12 at 26–27 (State's response)). The circuit court granted Thomas' request for appointment of counsel (ECF No. 21-12 at 28–29 (motion), 30 (order), 35 (counsel's notice of appearance)). The court held an evidentiary hearing on September 5, 2017, on all of Thomas' claims (ECF No. 21-

12 at 49–127 (transcript of evidentiary hearing)).  The circuit court denied the Rule

3.850 motion in an order rendered on September 14, 2017 (ECF No. 21-12 at 40–

46).  Thomas appealed the decision to the First DCA, Case No. 1D17-4851 (ECF

No. 21-12 at 47 (notice of appeal), ECF No. 21-13 (Thomas' initial brief), ECF No.

21-14 (State's answer brief)).  The First DCA affirmed the circuit court's decision

per curiam without written opinion on September 26, 2018 (ECF No. 21-15 at 2–3

(opinion)).  *Thomas v. State*, 253 So. 3d 1070 (Fla. 1st DCA 2018) (Table).  The

mandate issued October 24, 2018 (ECF No. 21-15 at 4 (mandate)).

Thomas filed his federal habeas petition on August 2, 2019 (ECF No. 1).

## II.    STANDARD OF REVIEW

A federal court "shall not" grant a habeas corpus petition on any claim that

was adjudicated on the merits in state court unless the state court's decision "was

contrary to, or involved an unreasonable application of, clearly established Federal

law, as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1).  The United

States Supreme Court explained the framework for § 2254 review in *Williams v.*

*Taylor*, 529 U.S. 362 (2000).[3]  Justice O'Connor described the appropriate test:

---

[3] Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice
Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in
parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the
Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia)
in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices
Souter, Ginsburg, and Breyer.

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Under the *Williams* framework, the federal court must first determine the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003).  After identifying the governing legal principle, the federal court determines whether the state court's adjudication is contrary to the clearly established Supreme Court case law.  The adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases.  *See Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").

If the "contrary to" clause is not satisfied, the federal court determines whether the state court "unreasonably applied" the governing legal principle set forth in the Supreme Court's cases.  The federal court defers to the state court's reasoning unless

the state court's application of the legal principle was "objectively unreasonable" in light of the record before the state court. *See Williams*, 529 U.S. at 409; *Holland v. Jackson*, 542 U.S. 649, 652 (2004). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Section 2254(d) also allows habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable application" clause, the federal court applies an objective test. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). "The question under AEDPA [the Antiterrorism and Effective Death Penalty Act of 1996] is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."

*Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

AEDPA also requires federal courts to "presume the correctness of state courts'

factual findings unless applicants rebut this presumption with 'clear and convincing

evidence.'" *Landrigan*, 550 U.S. at 473–74 (quoting 28 U.S.C. § 2254(e)(1)).

The Supreme Court has often emphasized that a state prisoner's burden under

§ 2254(d) is "difficult to meet, . . . because it was meant to be." *Richter*, 562 U.S.

at 102. The Court elaborated:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete
> bar on federal-court relitigation of claims already rejected in state
> proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333,
> 135 L. Ed. 2d 827 (1996) (discussing AEDPA's "modified res judicata
> rule" under § 2244). It preserves authority to issue the writ in cases
> where there is no possibility fairminded jurists could disagree that the
> state court's decision conflicts with this Court's precedents. It goes no
> further. Section 2254(d) reflects the view that habeas corpus is a "guard
> against extreme malfunctions in the state criminal justice systems," not
> a substitute for ordinary error correction through appeal. *Jackson v.
> Virginia*, 443 U.S. 307, 332, n.5, 99 S. Ct. 2781, 61 L. Ed. 2d 560
> (1979) (Stevens, J., concurring in judgment). As a condition for
> obtaining habeas corpus from a federal court, a state prisoner must
> show that the state court's ruling on the claim being presented in federal
> court was so lacking in justification that there was an error well
> understood and comprehended in existing law beyond any possibility
> for fairminded disagreement.

*Richter*, 562 U.S. at 102–03 (emphasis added).

A federal court may conduct an independent review of the merits of a

petitioner's claim only if it first finds that the petitioner satisfied § 2254(d). *See*

*Panetti v. Quarterman*, 551 U.S. 930, 954 (2007). Even then, the petitioner must show that he is in custody "in violation of the Constitution or laws and treaties of the United States," *see* 28 U.S.C. § 2254(a), and that the constitutional error resulted in "actual prejudice," meaning, the error "had a substantial and injurious effect or influence in determining the jury's verdict," *see Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks and citation omitted).

## III.  THOMAS' CLAIMS

### A.  Ground One:  "Counsel was ineffective for failing to seek a competency evaluation."

Thomas asserts the police report noted that after he was interrogated by Investigator Scott Beck, Thomas "stood and began to talk to himself" (*see* ECF No. 1 at 8–9). Thomas also alleges he told defense counsel that he was hearing voices, considering suicide, and that the deceased victim was coming to see him at the county jail (*id.* at 9). Thomas alleges defense counsel was "noncommittal" when Thomas told him this and requested help (*id.*). Thomas claims that defense counsel was ineffective for failing to request a competency evaluation (ECF No. 1 at 8–9; 10; ECF No. 8 at 4). Thomas alleges he was prejudiced by counsel's error, because he was forced to go to trial while he was incompetent (ECF No. 1 at 9; ECF No. 8 at 4). Thomas asserts he presented this ineffective assistance of trial counsel (IATC)

claim in his Rule 3.850 motion and his post-conviction appeal (ECF No. 1 at 10–11).

The State concedes Thomas exhausted this claim in the state courts (*see* ECF No. 21 at 10).  The State contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law (*id.* at 19–20).

### 1.    Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  To obtain relief under *Strickland*, the petitioner must show (1) deficient performance by counsel, and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *Id.* at 687–88.  If the petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697.

The focus of inquiry under the performance prong of *Strickland* is whether counsel's assistance was "reasonable considering all the circumstances," and reasonableness is measured "under prevailing professional norms."  *Strickland*, 466 U.S. at 688.  "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one."  *Jones v. Campbell*,

436 F.3d 1285, 1293 (11th Cir. 2006) (citing *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)).  "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.  "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

As to the prejudice prong of the *Strickland* standard, the petitioner's burden of demonstrating prejudice is high.  *See Wellington v. Moore*, 314 F.3d 1256, 1260 (11th Cir. 2002).  To establish prejudice, the petitioner must show "that every fair-minded jurist would conclude 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Jones v. GDCP Warden*, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting *Strickland*, 466 U.S. at 694).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome," not that counsel's conduct more likely than not altered the outcome of the proceeding.  *Id.* (citation omitted).  The petitioner must show that the likelihood of a different result is substantial, not just conceivable.

*Williamson v. Fla. Dep't of Corr.*, 805 F.3d 1009, 1016 (11th Cir. 2015) (citing *Richter*, 562 U.S. at 112). "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695.

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *Strickland*, 466 U.S. at 698; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999). "Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 131 S. Ct. at 788. As the *Richter* Court explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (citations omitted).

### 2.   Federal Review of State Court Decision

Thomas presented the instant Ground One as Ground One of his Rule 3.850 motion (ECF No. 21-12 at 7–8).   As previously noted, the state circuit court appointed counsel to represent Thomas and held an evidentiary hearing on all of Thomas' post-conviction claims.

At the evidentiary hearing, Dr. Greg Prichard testified he had practiced as a licensed psychologist in the State of Florida since 1996 (ECF No. 21-12 at 74).   He testified he had performed "several thousand" competency evaluations during that time and had testified in many courts as an expert in forensic psychology (*id.*).   Dr. Prichard testified he evaluated Thomas three times following Thomas' arrest on May 2, 2012, specifically, on May 14, 2012, May 23, 2012, and June 27, 2012 (*id.* at 74–75).   Dr. Prichard testified he had also evaluated Thomas during a prior criminal case in 2007, at which time Prichard concluded that Thomas suffered from an "intellectual disability" and was "marginally competent" (*id.* at 75–76).

Dr. Prichard testified that when he evaluated Thomas in 2012, he again concluded that Thomas was intellectually disabled (ECF No. 21-12 at 77).   Dr. Prichard testified that Thomas also had a history of mental illness, primarily related to depression (*id.* at 77–78).   Dr. Prichard testified he reviewed Thomas' medical records as part of his competency evaluation, and noted that Thomas reported

hearing voices and that the deceased victim had been visiting him (*id.* at 86–87).  Dr. Prichard testified he discussed this with Thomas, and although Prichard noted "some depression," he did not believe that Thomas was psychotic in any way (*id.* at 87). With respect to Thomas' competency to stand trial, Dr. Prichard testified he assessed Thomas' competency on May 14, 2012 and June 27, 2012, and on both occasions concluded that Thomas was competent to stand trial despite Thomas' intellectual disability and history of mental illness (*id.* at 77–78, 84–85).

Dr. Prichard testified he recalled that his competency report was confidential (i.e., procured by and provided to only defense counsel, not the court or the State) (ECF No. 21-12 at 87–88).  He testified that when he evaluated Thomas, the death penalty was still "on the table," but after his evaluation, the State took it "off the table" (*id.* at 88).

Thomas' trial counsel, Attorney Adam Ruiz, testified he was appointed to Thomas' case on March 25, 2013 (ECF No. 21-12 at 90).  Attorney Ruiz testified he was aware that Dr. Prichard had evaluated Thomas' competency and prepared a report dated February 6, 2013 (*id.* at 90–92).  Ruiz testified he reviewed Dr. Prichard's report (*id.* at 91–92).  Attorney Ruiz testified that, based upon his interactions with Thomas, Thomas was "a little challenged" and had a limited IQ, but Thomas was able to understand the matters they discussed, and Ruiz never had

any indication that Thomas was incompetent or of questionable competency (*id.* at 90–92, 105). Ruiz testified that Thomas' previous defense counsel, with whom Ruiz consulted upon being appointed to Thomas' case, essentially reinforced that (*id.* at 105). Attorney Ruiz testified that if he had any question about Thomas' competency, he would have requested additional competency evaluations (*id.* at 93).

Thomas testified that although he met with Dr. Prichard, Dr. Prichard did not evaluate his competency to stand trial (ECF No. 21-12 at 54, 57). Thomas testified he started hearing voices when he was "in the interrogation room" (*id.* at 55). He testified:

> I started hearing them when I was in the interrogation room and it was just a bunch of whispering and whatnot. And I was feeling suicidal and whatnot and the voice was telling me to kill myself. And the—the victim kept coming to see me.

(ECF No. 21-12 at 55). Thomas testified he had been released from "the psych ward" just one or two weeks prior to his altercation with the victim (*id.*). He testified he was in the "psych ward" for hearing voices, and had been diagnosed with schizophrenia and bi-polar disorder in 2007 (*id.* at 55–56). Thomas testified he wrote to Attorney Ruiz and "let him know" (*id.* at 56). Thomas testified he "didn't understand at all" what was going on during the criminal proceedings (*id.* at 56–57). He testified that when Attorney Ruiz discussed going to trial and things of that

nature, he (Thomas) did not understand (*id.* at 57). When asked whether he and Attorney Ruiz discussed that, Thomas testified, "I can't remember" (*id.*).

On cross-examination, Thomas testified he had been convicted of more than ten felonies (ECF No. 21-12 at 66). Thomas testified he told Attorney Ruiz that he wanted to present a self-defense theory at trial (*id.*). Thomas testified he explained to Ruiz what witnesses he needed to call and the facts he needed to present in order to establish self-defense (*id.* at 66–67). Thomas testified he also asked Attorney Ruiz to exclude statements he (Thomas) allegedly made about not liking white people (the victim was white) (*id.*).

Counsel for the State questioned Thomas about his understanding of the trial proceedings:

> Q. Now, what part about the trial didn't you understand?
>
> A. I really—I didn't understand, I mean, really why I was going like—I can't really explain it.
>
> Q. You knew what you were charged with. You knew you were charged with murder; is that right?
>
> A. Yeah. I knew I was charged with murder.
>
> Q. You knew you could get life in—
>
> A. But the thing is—
>
> Q. —prison; is that right?

A.  Sir?

Q.  You knew you could get life in prison for that?

A.  Yes, sir.

Q.   And you knew that Mr. Campbell was trying to get you convicted to sentence [sic] life, didn't you?  That was the prosecutor.

A.  I really didn't—

Q.  What did you think he was doing then?

A.  I really can't remember.

Q.   You can't remember what the prosecutor did.  Now, you remember what he said during closing arguments that you said was not—not legally correct and not factually correct.  But you didn't know what he was trying to do at the time?

A.  Not at that point in time, I didn't.

Q.  What did you think he was trying to do?

A.  I don't know.

Q.  You know what the judge was doing?

A.  Sitting there listening.

Q.  And anybody make [sic] any objections?

A.  I think Adam [Ruiz] made like one or two objections.

Q.   Judge ruled on the objections and told [sic] it was either overruled or sustained?

A.  She said something like that.  I can't—I don't remember.

(ECF No. 21-12 at 67–68).

In the state circuit court's written decision denying Thomas' IATC claim, the court correctly cited the *Strickland* standard as the legal standard applicable to IATC claims (ECF No. 21-12 at 41). The court adjudicated this particular IATC claim as follows:

> As to Defendant's first claim, the testimony during the post conviction hearing confirmed that Dr. Gregory Prichard conducted a confidential competency evaluation of Defendant and found him competent to proceed, even though he was found to have a mental disability and to have several mental health conditions. Dr. Prichard had previously evaluated Defendant and had knowledge of his mental health conditions and disabilities. In fact, Defendant's low IQ actually benefited the Defendant because it removed the death penalty as a potential sanction in this case. Counsel relied on Dr. Prichard's confidential evaluation in deciding not to pursue the competency issue before the Court. Though there was no competency evaluation ordered by the Court, it is clear that Defendant's competency to proceed was considered by counsel, and the issue was reasonably resolved by counsel in deciding not to pursue it further.

> Moreover, Defendant's own testimony at the hearing on his post conviction motion confirmed that he participated in developing potential defenses, suggested to Counsel the need to exclude his racially motivated statements, and suggested mitigation arguments relating to his mental conditions. He also had several lengthy conversations with the Court during the trial. *See* Trial Transcript p. 12, l[ine] 25–p. 17, l[ine] 6; p. 252, 1[ine] 21– [p.] 254, l[ine] 6. Defendant's actions and words confirm his competency to stand trial at the time of the trial of this matter. Moreover, his testimony before the Court at the time of the hearing on his post conviction motion confirmed his continuing competency. Counsel's actions were not deficient in any regard and, even if they were deficient did not result in any prejudice. If asked to

consider the issue, this Court would have found Defendant competent nunc pro tune to stand trial based on Dr. Prichard's testimony during the post conviction hearing.  Claim I is DENIED.

(ECF No. 21-12 at 41–42) (paragraph numbers omitted).  The First DCA affirmed the circuit court's decision without explanation (ECF No. 21-15 at 2).

In *Wilson v. Sellers*, 138 S. Ct. 1188 (2018), the Supreme Court held that where there has been one reasoned state judgment rejecting a federal claim followed by a later unexplained order upholding that judgment or rejecting the same claim, federal habeas courts employ a "look through" presumption.  The *Wilson* Court described this presumption as follows:

> We hold that the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale.  It should then presume that the unexplained decision adopted the same reasoning.

*Id.* at 1192.

Looking through the First DCA's unexplained decision, and considering the evidence presented during the evidentiary hearing, the state court reasonably rejected Thomas' IATC claim.

The standard for determining a defendant's mental competency to stand trial is the same under federal law and Florida law:  whether a defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the

proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam); *Drope v. Missouri*, 420 U.S. 162, 171 (1975); *Peede v. State*, 955 So. 2d 480, 488 (Fla. 2007). "[N]either low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." *Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir. 1995) (citation omitted). Further, a lifelong history of mental illness and emotional problems does not demonstrate incompetency without a specific showing of how these difficulties generated a substantial doubt as to the defendant's competency at the time in question. *See id.* at 1106. Similarly, the fact that the accused is undergoing treatment with psychiatric drugs, while relevant, does not alone prove incompetence. *See Sheley v. Singletary*, 955 F.2d 1434, 1438–39 (11th Cir. 1992). In order to establish incompetence, evidence must establish that the drugs affected the accused to the point that he could not effectively consult with his attorney and could not understand the proceedings. *See id.* at 1439.

To assess the reasonableness of defense counsel's failure to request a competency evaluation, the court must focus on what defense counsel did in light of what counsel then knew, and whether objective facts known to counsel were sufficient to raise a bona fide doubt as to the defendant's competency. *See James v.*

*Singletary*, 957 F.2d 1562, 1572 n.15 (11th Cir. 1992); *Fallada v. Dugger*, 819 F.2d 1564, 1568 (11th Cir. 1987) (citations omitted).

Here, considering the fact that Dr. Prichard assessed Thomas' competency and concluded that Thomas was competent to stand trial, the state court reasonably concluded that Attorney Ruiz was not deficient for failing to request another competency evaluation.  Additionally, considering Dr. Prichard's conclusion that Thomas was competent, the state court reasonably concluded that there was no reasonable probability the result of the proceedings would have been any different if Attorney Ruiz had requested another competency evaluation.  *See Lawrence v. Sec'y, Fla. Dep't of Corr.*, 700 F.3d 464, 479 (11th Cir. 2012) (holding that in order to establish *Strickland* prejudice based upon counsel's failure to request a competency hearing, a petitioner must show that "there was a reasonable probability that he would have received a competency hearing and been found incompetent had counsel requested the hearing.").

Thomas has failed to demonstrate that the state court's adjudication of Ground One was contrary to or an unreasonable application of *Strickland*, or based upon an unreasonable determination of the facts in light of the evidence presented. Therefore, Thomas is not entitled to federal habeas relief on Ground One.

**B.   Ground Two: "Counsel was ineffective for failing to request a self-defense instruction."**

Thomas alleges that at trial, Frederick Franklin testified that the victim was known for carrying a knife (*see* ECF No. 1 at 11–12; ECF No. 8 at 4–5). Thomas alleges Mr. Franklin testified that he (Thomas) "did not have the gun until they [Thomas and the victim] got into it" (*id.* at 12). Thomas asserts this testimony was sufficient to warrant a self-defense instruction (*id.* at 11–12). Thomas alleges his entire defense rested on the fact that his shooting of the victim was accidental and would not have occurred had the victim not attacked him (*id.* at 11). Thomas alleges Attorney Ruiz's failure to request a self-defense instruction deprived him of a viable defense (*id.* at 12). He asserts if Ruiz had requested a self-defense instruction, there is a reasonable probability the trial court would have given it and the outcome of trial would have been different (*id.*). Thomas asserts he presented this IATC claim in his Rule 3.850 motion and his post-conviction appeal (*id.* at 13).

The State concedes Thomas exhausted this claim in the state courts (*see* ECF No. 21 at 10). The State contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of *Strickland* (*id.* at 21).

### 1.   Clearly Established Federal Law

The *Strickland* standard governs this IATC claim.

### 2.    Federal Review of State Court Decision

Thomas presented Ground Two as Ground Two of his Rule 3.850 motion (ECF No. 21-12 at 9–10).  The trial transcript was part of the post-conviction record (*see* ECF no. 21-12 at 108) and shows that the following evidence was presented at Thomas' trial.

Sarah Abner testified that in May of 2012, she was living at 1440 Nashville Drive with her goddaughter and her boyfriend, Frederick Franklin (ECF No. 21-2 at 190–92).  Ms. Abner testified that Henry Isom or "Unc" was also staying at her house (*id.* at 197).  Ms. Abner testified that she knew Thomas and the victim, Steve Brown (*id.* at 192–96).  Ms. Abner testified that on the night Steve was shot, Fred, Steve, and Thomas were sitting in front of the house talking and drinking (*id.* at 196–99).  Ms. Abner testified that Steve planned to go to Wal-Mart and asked Thomas if he wanted anything (*id.* at 199–200).  Ms. Abner testified that Thomas told Steve he didn't want anything, but Steve kept repeatedly asking Thomas, and Thomas kept saying no (*id.* at 200, 203).  Ms. Abner testified she and Steve walked down the street to collect cans, and then Steve turned around and went back to the house (*id.* at 200).  Ms. Abner testified she kept walking down the street, and approximately five minutes later, she heard a shot (*id.* at 203–04).  She testified she turned around, dialed 911, and started running back to the house (*id.* at 200–01).  Ms. Abner testified

that when she got to the house, she ran around a car and saw Steve on the ground (*id.* at 201, 203). Ms. Abner testified Thomas was gone (*id.*). She testified "Unc" was in the house asleep (*id.*). Ms. Abner testified Thomas had a gun that night and "had it right here on my table" (*id.* at 201, 202).

Frederick Franklin testified that prior to Steve getting shot, Steve and Thomas got into a fight (ECF No. 21-2 at 210–15). Mr. Franklin testified he was sitting down, and Steve was sitting next to him (*id.* at 218). Franklin testified that Steve "said something smart" to Thomas, and Thomas stood up and pulled out a pistol (*id.* at 217–18). Mr. Franklin testified that Steve "jumped up and rushed" Thomas even though Thomas was holding a pistol (*id.* at 215, 221). Mr. Franklin testified both men fell on the ground and were rolling around on the ground (*id.* at 221). He testified that the next thing he knew, he heard a gunshot (*id.* at 221). Mr. Franklin testified Thomas got off the ground to leave, and Steve was getting up too but then said, "Oh" and fell back to the ground (*id.* at 221–22). Mr. Franklin testified that after Thomas shot Steve, Thomas told Franklin, "You ain't [sic] seen nothing" (*id.* at 224). Mr. Franklin testified that Steve usually carried a knife, but Steve did not pull out a knife at any time that night (*id.* at 218).

Mr. Franklin admitted he told police something different when they interviewed him on the night of the shooting (ECF No. 21-2 at 223). Franklin

admitted he told police that Thomas was pistol whipping Steve in the head and beat Steve down, and then Thomas stood up and shot Steve while Steve was lying on the ground (*id.* at 223–24).

Henry Isom testified he awoke when he heard a shot ((ECF No. 21-2 at 227–29). Mr. Isom testified he ran to the door and saw a man lying on the ground and another man standing over him with a gun (*id.* at 229–30). Mr. Isom testified that the man on the ground was a white man, and the man holding the gun was Thomas (*id.* at 230). Mr. Isom testified he heard Thomas say, "You bad mother fucker you, you dead now. I don't like white folks." (*id.*). Mr. Isom testified Thomas then walked away (*id.*).

Annie Williams testified she was a latent finger print examiner with the Broward County Sheriff's Office but previously worked at the Tallahassee Police Department as a forensic specialist (ECF No. 21-2 at 233). Ms. Williams testified she went to the crime scene and swabbed Steve Brown's forehead, cheek, nose, and fingers to collect any blood or "touch DNA" (*id.* at 238–39, 245–47). She testified she also used a wooden tool to scrape under each of Brown's fingernails (*id.* at 239). Ms. Williams testified she placed the swabbings and scrapings in secure packaging and sent them to the Florida Department of Law Enforcement (FDLE) for DNA testing (*id.* at 239–45). Ms. Williams testified she observed several head injuries on

Mr. Brown (*id.* at 248). Photographs of the Mr. Brown's body were admitted into evidence. Ms. Williams testified she also took photographs of Thomas' body and collected buccal swabs from his cheek for DNA comparison (ECF No. 21-2 at 253–56). Ms. Williams testified she observed a laceration on the left side of Thomas' neck (*id.* at 255).

Dr. Anthony Clark testified he performed an autopsy on Steve Brown's body (ECF No. 21-2 at 278–302). Dr. Clark testified that the cause of Mr. Brown's death was a "contact" gunshot wound of the abdomen (*id.* at 283). Dr. Clark testified that a "contact" gunshot wound is when the muzzle of the gun has been placed firmly against the skin (*id.*). Dr. Clark testified he saw the muzzle abrasion where the muzzle was pressed to Mr. Brown's skin (*id.* at 283–84). Dr. Clark testified he also saw searing from the gun's hot gases within the depths of the gunshot wound (*id.* at 284). Dr. Clark testified he saw soot deposits, from the discharge of the gunpowder, and gunpowder particles (*id.*). Dr. Clark testified he also saw "multiple pattern lacerations" on Mr. Brown's face and head, which were consistent with his being whipped with a pistol (*id.* at 286–87). Dr. Clark testified it appeared that Mr. Brown was hit in the head with the pistol approximately nine times (*id.* at 287–88). Dr. Clark testified that toxicology reports showed the presence of cocaine and alcohol in Mr. Brown's system (*id.* at 289). Dr. Clark testified he saw a laceration at the

base of the middle finger of the palm of Mr. Brown's right hand (*id.* at 292). Dr. Clark testified this type of injury could be caused by Mr. Brown putting up his hand to protect himself (*id.*). Dr. Clark testified that it looked as if Mr. Brown was in a physical altercation (*id.* at 299). Dr. Clark testified that Mr. Brown was five feet, six and a half inches tall, and weighed 165 pounds (*id.* at 303).

Scott Beck testified he was an investigator with the Tallahassee Police Department (ECF No. 21-2 at 323). Investigator Beck testified he made contact with Thomas several hours after the shooting at Thomas' sister's house, which was one block from the crime scene (*id.* at 324–25). Investigator Beck testified Thomas was transported to the police department, and Beck interviewed him there (*id.* at 325–26). Investigator Beck testified he advised Thomas of his *Miranda* rights, and Thomas agreed to be interviewed (*id.* at 326–28). The audio recording of the interview was published to the jury (*id.* at 330–54). During the interview, Thomas told Investigator Beck he was at his sister's house drinking on the night of the shooting (*id.*). Thomas stated he was at his sister's all night and passed out on the floor (*id.*). Thomas told Beck that the next morning, his "homeboys" woke him up and told him that he was accused of shooting someone (*id.*).

Chris Bacot testified he was a forensic biologist with the FDLE (ECF No. 21-2 at 365). Mr. Bacot testified he compared the DNA profiles of Steve Brown and

Thomas with DNA profiles he was able to obtain from the scrapings from under Steve Brown's fingernails (*id.* at 374). Mr. Bacot testified he found DNA matching Thomas' from the scrapings under Brown's fingernails from his right thumb, right index finger, right middle finger, left thumb, left middle finger, and left little finger (*id.* at 374–75). Mr. Bacot testified he examined the swabbings of Steve Brown's forehead and cheeks and obtained a partial DNA profile that matched Thomas' (*id.* at 376–77).

As relevant to Ground Two, the trial court instructed the jury as follows:

In this case Jacob Thomas is accused of first degree murder. Murder in the first degree includes the lesser crimes of murder in the second degree and manslaughter, all of which are unlawful.

A killing that is excusable or was committed by the use of justifiable deadly force is lawful. If you find Steven Brown was killed by Jacob Thomas, you will then consider the circumstances surrounding the killing in deciding if the killing was murder in the first degree, or was murder in the second degree, or manslaughter, or whether the killing was excusable or resulted from justifiable use of deadly force.

Justifiable homicide. The killing of a human being is justifiable homicide and lawful if necessarily done while resisting an attempt to murder or commit a felony upon the defendant, or to commit a felony in any dwelling house in which the defendant was at the time of the killing.

Excusable homicide. The killing of a human is excusable, and, therefore, lawful under any one of the following three circumstances. One, when the killing is committed by accident and misfortune, in doing any lawful act by lawful means with usual, ordinary caution and

without any unlawful intent; or two, when the killing occurs by accident and misfortune in the heat of passion, upon any sudden and sufficient provocation; or three, when the killing is committed by accident and misfortune resulting from a sudden combat if a dangerous weapon is not used and the killing is not done in a cruel or unusual manner.

(ECF No. 12-2 at 414–15).

At the post-conviction evidentiary hearing, Thomas testified that Attorney Ruiz never came to see him at the jail and never responded to his letters (ECF No. 21-12 at 56). Despite this testimony, Thomas testified he discussed with Ruiz that he wished to pursue a self-defense theory (*id.* at 57–59). Thomas testified he and Attorney Ruiz discussed the fact that the victim was known to carry a knife, and the victim approached or attacked him first (*id.* at 59–60). Thomas testified that, based upon those discussions, he believed that Ruiz was going to request a self-defense jury instruction (*id.* at 60).

On cross-examination, Thomas acknowledged that when he was interviewed by police, he told them he was never at the scene of the murder (ECF No. 21-12 at 69, 72). Thomas also acknowledged that Frederick Franklin was the only person who was present when the murder occurred, and that Franklin had testified that Thomas had a pistol, and the victim did not pull out a knife (*id.*). Thomas admitted that he (Thomas) was the only person who could have or would have testified that the victim pulled a knife and cut him before he (Thomas) shot him (*id.*). Thomas

acknowledged that when the trial judge asked him if he wanted to testify, he said no (*id.* at 70).

Attorney Ruiz testified that the choice of defense theories was difficult, because Thomas told police he was at his sister's house sleeping when the shooting occurred, but there were witnesses who said that Thomas was at the scene prior to, during, and after the shooting (ECF No. 21-12 at 94–96).  Ruiz testified that some of the witnesses were "animated, let's say . . . so we didn't really know what they were going to say when they actually took the stand." (*id.* at 95).  Ruiz testified, "And so we had that kind of fluid defense attacking the State's case because you don't want to lock yourself into one thing in opening . . . because you never knew what these . . . witnesses were going to say." (*id.*).

Attorney Ruiz testified that Thomas' story to his initial defense team (attorneys from the public defender's office) was the story he told police, i.e., that he was at his sister's house sleeping at the time of the shooting (ECF No. 12-21 at 96).  Counsel for the State asked Ruiz when Thomas transitioned his story from "I was never there to I was there?" (*id.*).  Attorney Ruiz answered:

> I mean I'm—I'm not sure he did. . . .  It's like it was such a—if you could have seen the—the witnesses in this case, it was so difficult to—to control them.  And the defendant, I mean, he was basically—I don't ever recall him saying, you know, okay I was there, here's what happened.  And that's one of the reasons why I couldn't put him on the stand was because, you know, he couldn't—you know, I had these two

things going on and it was very hard to get a clear defense because, you know, he was—everything he was saying didn't—the evidence didn't add up.  So it put me in a really difficult position as a defense attorney trying to have a clear cut, you know, plan for him.  It happens sometimes.

Q.   All right.   So the defendant never admitted to—really admitted to being there, and what he did start to tell you about was contradicted by the physical evidence and the other evidence in the case?

A  Right.

Q.  So you really didn't have a witness to put on for self-defense, did you?

A  No. what happened was, you know, there was a—he had a sister, okay?  But the sister was going to basically say that, okay, when she went to sleep he was there and when she got up he was there, you know.  But okay well, you know, where was he between, you know, 10:00 p.m. and 8:00 a.m.?  And that was the whole thing there and that didn't really—and I—I felt like he would need to testify in my opinion to kind of, you know, to bolster that testimony which, for a lot of reasons, I didn't think it was a good idea and so that's that.

Q   And witness Franklin who the defendant points at during his—in his motion about the tussling about, it [sic] had indicated that the defendant pulled the gun first and the victim wasn't displaying any weapon or anything such as that whenever the tussling took place?

A.  Right.

Q.   But he had also previously testified that the victim was pistol—the defendant was pistol whipping the victim and shot the victim while he was laying [sic] on the ground after he had pistol whipped him down.

A.  Correct.

Q. And then you also had Mr. Isom who was the older gentleman who said he heard the shots, came out, saw the victim on the ground and the defendant standing over him basically saying, you know, you're dead now along with a couple other statements.

. . . .

Q. And another witness who also saw the defendant with a gun that night, is that right?

. . . .

A. Ms. Sarah?

Q. Yeah.

A. Right.

Q. Saw the defendant with a gun that night as well?

A. In a towel or something like that if I recall correctly.

(ECF No. 21-12 at 96–99).

Attorney Ruiz testified that a theory that the victim was committing a simple battery upon Thomas at the time Thomas shot him would not have supported a self-defense instruction, because there was no evidence that the victim was armed with any weapon, and deadly force cannot be used to resist a "simple" battery under Florida law (ECF No. 21-12 at 104–05).

The post-conviction court heard closing arguments from counsel. Thomas' post-conviction counsel argued that the trial evidence showed that there was a physical struggle between the victim and Thomas (*id.* at 113–14). The court inquired how counsel could overcome the legal hurdle of the unavailability of self-defense

when the use of deadly force was in response to a simple battery (*id.* at 113).

Thomas' counsel acknowledged that the hurdle was "overwhelming" and deferred

to the trial transcript for a determination of whether the evidence supported a self-

defense instruction (*id.* at 113–14).  Thomas' counsel also conceded that self-defense

was a difficult argument to make considering Thomas' statement to police that he

was not at the scene at the time of the shooting (*id.* at 116–17).

The state circuit court adjudicated this particular IATC claim as follows:

> Defendant next claims that counsel was ineffective for failing to
> request a self defense instruction.  However, a justifiable use of force
> instruction would not have been appropriate based on the evidence and
> would not have aided Defendant in any event.  Defendant used deadly
> force.  There was no evidence that such force was justified.  Instead,
> the evidence confirmed that the victim was defenseless at the time of
> the shooting, having already been inebriated and then having received
> several blows to the head from a gun.  The instructions actually used in
> this case were more appropriate, in that they allowed for excusable
> homicide based on accident and sudden combat.  Counsel did not error
> in failing to request an instruction which was not appropriate based on
> the evidence and law applicable here.  Moreover, Defendant has
> suffered no prejudice given that the facts here would not have supported
> a jury finding of justifiable use of force.  Claim 2 is DENIED.

(ECF No. 21-12 at 42–43) (paragraph numbers omitted).  The First DCA affirmed

the circuit court's decision without further explanation (ECF No. 21-15).

The state court reasonably rejected Thomas' claim that Attorney Ruiz was

ineffective for failing to request additional jury instructions on the justification

defense (i.e., self-defense).  A defendant is entitled to a jury instruction on a theory

of his defense only if there is evidence in the record to support it. *See Palmes v. State*, 397 So.2d 648 (Fla. 1981). Here, the trial transcript supports the state court's determination that there was no evidence that Thomas' use of deadly force was justified by self-defense; and instead, the evidence showed that the victim was defenseless at the time of the shooting, having been inebriated and then receiving several blows to the head from Thomas' gun.

Frederick Franklin testified that the victim usually carried a knife but did **not** pull out a knife at any time on the night of the shooting. And although the evidence showed that the victim physically struggled with Thomas, there was no evidence that the victim committed, or attempted to commit, more than a simple battery upon Thomas. As the state court opined, self-defense was not available to Thomas, because the use of deadly force is not legally justified in response to a "simple" battery (i.e., an unwanted touch or strike where no weapon is involved).

Thomas has not demonstrated that the state court's adjudication of Ground Two was based upon an unreasonable determination of the facts, or that it was contrary to or an unreasonable application of *Strickland.* Therefore, Thomas is not entitled to federal habeas relief on Ground Two.

**C.    Ground Three:  "Counsel was ineffective for failing to file a motion in limine regarding defendant's racial statement."**

Thomas asserts Attorney Ruiz was ineffective for failing to file a motion in limine to preclude Henry Isom's testimony that he heard Thomas say he did not like white people (*see* ECF No. 1 at 14–15; ECF No. 8 at 5–7).  Thomas contends the prejudicial effect of this evidence far outweighed its probative value, especially because the jury was predominantly comprised of white people (ECF No. 1 at 14–15).  Thomas contends there is a reasonable probability the outcome of his trial would have been different if Ruiz had sought to exclude the statement (*id.*).  Thomas asserts he presented this IATC claim in his Rule 3.850 motion and his post-conviction appeal (*id.* at 16).

The State asserts an exhaustion defense (ECF No. 21 at 22).  The State argues that although Thomas presented this claim in his Rule 3.850 motion, he did not present it in his appeal of the circuit court's decision denying the motion (*id.*).  Therefore, Thomas procedurally defaulted the claim, and it is thus procedurally barred from federal review (*id.*).  The State contends that notwithstanding Thomas' failure to exhaust, the claim is without merit (*id.* at 22–26).

The record demonstrates that Thomas presented Ground Three as Ground Three of his Rule 3.850 motion (ECF No. 21-12 at 11–12).  As previously discussed, the circuit court held an evidentiary hearing on all of Thomas' claims and then

denied the Rule 3.850 motion (*see id.* at 40–46, 49–127).  Thomas appealed the circuit court's decision to the First DCA, but in his initial brief, he did not argue error with respect to Ground Three (*see* ECF No. 21-13).

In Florida, where the circuit court denies a Rule 3.850 motion following an evidentiary hearing, any claim that the defendant does not brief on appeal is deemed waived.  *See* Fla. R. App. P. 9.141(b)(3)(C); *Pennington v. State*, 34 So. 3d 151, 152 n.1 (Fla. 1st DCA 2010).  Here, the record demonstrates that Thomas did not brief Ground Three in the post-conviction appeal.  By failing to do so, he waived appellate review of, and thus failed to properly exhaust, Ground Three.  *See, e.g., Myers v. Sec'y, Fla. Dep't of Corr.*, No. 19-14060-A, 2020 WL 6156872, at *1 (11th Cir. Jan. 29, 2020) (habeas petitioner failed to properly exhaust claims which he presented in his Rule 3.850 motion but failed to brief in his post-conviction appeal) (unpublished but cited as persuasive authority); *Ambert v. Sec'y, Fla. Dep't of Corr.*, No. 19-10644-H, 2019 WL 8063061, at *2 (11th Cir. Sept. 5, 2019) (same).

Thomas has not alleged, let alone shown, that he is qualifies for review of Ground Three under any recognized exception to the procedural bar.  Therefore, Thomas is not entitled to habeas relief on Ground Three.

### D.    Ground Four:    "Counsel was ineffective for failing to introduce evidence of protection."

Thomas alleges Attorney Ruiz was ineffective for failing to present evidence of the reason he was carrying a gun at the time of the shooting (*see* ECF No. 1 at 17–18; ECF No. 8 at 7–9).  Thomas alleges he told Attorney Ruiz he was carrying a firearm because he had been beaten up several times (not by the victim), with the most recent incident occurring just a few days prior to the shooting (ECF No. 1 at 17).  Thomas alleges Frederick Franklin also could have testified that he (Thomas) was beaten up on several occasions (*id.*).  Thomas contends this evidence would have shown that he was carrying a firearm for his own protection and acted in self-defense when he shot the victim (*id.* at 17–18).  Thomas argues this evidence also would have cast doubt on the intent element by showing that he did not carry the gun for malice, ill will, or hatred (*id.* at 18).  Thomas contends there is a reasonable probability the outcome of his trial would have been different if Attorney Ruiz had introduced evidence that he (Thomas) carried the gun for protection (*id.*).  Thomas asserts he presented this IATC claim in his Rule 3.850 motion and his post-conviction appeal (*id.* at 19).

The State concedes Thomas exhausted this claim in the state courts (ECF No. 21 at 10).  The State contends the state court's adjudication of the claim was not

based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of *Strickland* (*id.* at 27–29).

### 1.    Clearly Established Federal Law

The *Strickland* standard governs this IATC claim.

### 2.    Federal Review of State Court Decision

Thomas presented Ground Four as Ground Four of his Rule 3.850 motion (ECF No. 21-12 at 13–14). At the post-conviction evidentiary hearing, Thomas testified that, contrary to what he told police, he **was** at Sarah Abner's house on the night of the shooting (ECF No. 21-12 at 59). Thomas testified that the victim was known to carry a knife (*id.*). Thomas testified the victim attacked him first, and he (Thomas) shot the victim in self defense (*id.*). Thomas testified he discussed this with Attorney Ruiz prior to trial (*id.*). Thomas testified that Ruiz should have presented testimony that he (Thomas) had previously been badly beaten and carried a gun for protection (*id.* at 62).

On cross-examination, Thomas admitted that he was the only person who could have testified that the victim pulled a knife on him, because Frederick Franklin was the only other eyewitness, and Franklin had testified that the victim did **not** pull out a knife (ECF No. 21-12 at 69). Thomas admitted that the jury heard his statement to police that he was not present when the victim was shot; and he admitted that the

jury heard testimony that the police recovered guns from his home but did not recover the murder weapon (*id.* at 71–72).  Thomas admitted that evidence that he carried a gun for protection and shot the victim in self-defense would have  been contrary to this evidence (*id.* at 72).

Attorney Ruiz testified that Thomas was initially represented by three other attorneys (ECF No. 21-12 at 92–94).  Ruiz testified that when he was appointed to represent Thomas, he discussed the case with Thomas' former counsel (*id.* at 92–93).  Attorney Ruiz testified that Thomas' former counsel was adamant that Thomas was innocent because he was not present at the scene when the shooting occurred (*id.* at 94, 96).  Ruiz testified that preparing a defense strategy was difficult considering Thomas' insistence to police that he was not at the scene, and the contradictory evidence that he was there (from Sarah Abner, Frederick Franklin, and Henry Isom) (*id.* at 96–99).  Attorney Ruiz testified he did not recall that Thomas ever admitted to him that he was at the scene, or that Thomas disclosed any facts suggesting he shot the victim in self-defense (*id.* at 97).  Ruiz testified that the only person who could have testified that Thomas acted in self-defense was Thomas himself, but he chose not to testify (*id.* at 97–99).

Specifically regarding Thomas' claim that Attorney Ruiz should have presented evidence that Thomas carried a gun for personal protection, Ruiz testified

that the murder weapon was never recovered, and "I wouldn't want to put a gun in my client's hands, obviously" (ECF No. 21-12 at 101–02).

The state circuit court denied Thomas' IATC claim as follows:

> Defendant next claims that counsel was ineffective because he failed to offer any evidence relating to Defendant's need for personal protection as a justification for carrying the firearm he used during the murder. As a matter of strategy, counsel did not want to confirm that he had the firearm in question. It was never recovered. In his statement to the police he denied even being present when the gun was used. Putting the gun in his hand for any purpose was not consistent with Defendant's denial that he was present during the shooting.

> More importantly, while such evidence may have explained why he had the firearm, it would not have excused his use of the firearm to murder the victim. It may have justified his possession of a firearm; it would not excuse his use of the firearm in the manner confirmed by the verdict here. Counsel's actions were not deficient, and Defendant has suffered no prejudice regarding that action. Claim 4 is DENIED.

(ECF No. 21-12 at 44) (paragraph numbers omitted). The First DCA affirmed the circuit court's decision without explanation (ECF No. 21-15).

The state court reasonably concluded that Thomas failed to demonstrate he was prejudiced by Attorney Ruiz's failure to present evidence that Thomas carried a gun for self-protection. Even if the jury heard evidence of the reason Thomas carried a gun, there is no reasonable probability they would have returned a different verdict, because there was no evidence that the victim committed more than a

"simple" battery against Thomas during their argument, and a justification defense (self-defense) was not available under such circumstances.

Thomas has not demonstrated that the state court's adjudication of Ground Four was based upon an unreasonable determination of the facts, or that it was contrary to or an unreasonable application of *Strickland*.  Therefore, Thomas is not entitled to federal habeas relief on Ground Four.

**E.    Ground Five:  "Counsel was ineffective for failing to object to the State's use of facts not in evidence during closing argument."**

Thomas asserts the prosecutor made improper comments during closing arguments (*see* ECF No. 1 at 20–22; ECF No. 8 at 9–11).  Thomas alleges the following comments constituted improper bolstering:

> There's no way for that threat [sic] to go through like a—like a laser, but for it being the truth.  It was in the truth in the mind of a woman who picks up cans [Sarah Abner].  It was the truth of a man now sitting in jail facing cocaine charges [Frederick Franklin].  It was the truth of a sleeping 82 year old [Henry Isom].  And it's the same truth that rings true in this courtroom today, when it's testified to by a medical examiner, a DNA expert and a firearms expert.
>
> The only way in the world that six—those six people can speak with one voice is because they are all telling the same truth.

(ECF No. 1 at 20) (citing the trial transcript, ECF No. 21-2 at 450).

Thomas alleges the following comments were a misrepresentation of the evidence:

> There is no evidence before this jury, none at all, that Steven Brown
> was trying to commit a crime against Jacob Thomas . . . . There is no
> evidence of that.

(ECF No. 1 at 21) (citing the trial transcript, ECF No. 21-2 at 301).

Thomas alleges the cumulative effect of the prosecutor's allegedly improper comments deprived him of a fair trial (ECF No. 1 at 20–22). He contends Attorney Ruiz was ineffective for failing to object to the comments (*id.*). Thomas asserts he presented this IATC claim in his Rule 3.850 motion and his post-conviction appeal (*id.* at 23).

The State concedes Thomas exhausted this claim in the state courts (ECF No. 21 at 10). The State contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of *Strickland* (*id.* at 29–38).

### 1.    Clearly Established Federal Law

The *Strickland* standard governs this IATC claim.

### 2.    Federal Review of State Court Decision

Thomas presented Ground Five as Ground Five of his Rule 3.850 motion (ECF No. 21-12 at 15–18).

Attorney Ruiz addressed this claim during his testimony at the evidentiary hearing (ECF No. 21-12 at 103–04). Ruiz testified he made strategic decisions

regarding when to make objections (*id.* at 103–04).  With respect to the alleged bolstering, Ruiz testified he did not interpret the prosecutor's comment as bolstering the witnesses' credibility (*id.*).  Ruiz further testified that the witnesses were very credible, and he did not want the jury to perceive a credibility-related objection as an attack on the witnesses (*id.* at 103–04).

With respect to the prosecutor's comment regarding the absence of evidence that the victim was attempting to commit a crime against Thomas, Attorney Ruiz testified that the comment was accurate (ECF No. 21-12 at 104).  Ruiz testified that there was no evidence that Thomas was defending a criminal attack when he shot the victim (*id.*).

The state circuit court adjudicated this particular IATC claim as follows:

### CLAIM 5(a)

> With respect to Defendant's claim that the State Attorney improperly bolstered the testimony of the state witnesses, a review of the transcript confirms that there was no improper bolstering.  The State Attorney did not say "you should believe these witnesses because I believe these witnesses."  He essentially said "you should believe these witnesses because there is a consistency between their testimony which confirms that it is true."  It is not improper to argue that witnesses should be believed because they testified consistently.  That is actually part of the standard jury instructions.  Thus, there was nothing deficient about counsel's performance and Defendant has suffered no prejudice. Claim 5(a) is DENIED.

## CLAIM 5(b)

Defendant next claims that his counsel was ineffective for failing to object to the State Attorney's statement that "there is no evidence" that the victim was trying to commit a crime at the time of the incident that led to his death. The evidence submitted during the trial confirmed, at best, a mutual combat between Defendant and the victim. At worst, it was a brutal attack by a man with a gun against an unarmed, inebriated man. The State attorney was well within his right to argue the evidence in the light most favorable to the State. Even looking at the evidence in the light most favorable to the defense, the victim was not committing any crime—he was participating in mutual combat. Thus, counsel was not deficient for failing to object, as such an objection would have been overruled. Similarly, Defendant has suffered no prejudice based on his counsel's failure to pursue a fruitless argument. Claim 5 (b) is DENIED.

## CLAIM 5(c)

With respect to Defendant's claim of cumulative error, the Court finds no evidence of error with respect to the State's closing argument. There was thus no deficient performance, nor any prejudice to Defendant. Claim 5 (c) is DENIED.

(ECF No. 21-12 at 44–45) (paragraph numbers omitted). The First DCA affirmed

the circuit court's decision without explanation (ECF No. 21-15).

Under Florida law, wide latitude is permitted in arguing to a jury. *Breedlove*

*v. State*, 413 So. 2d 1, 8 (Fla. 1982). Logical inferences may be drawn from the

evidence, and counsel is allowed to advance all legitimate arguments. *Id.* This state

rule is essentially the same as the federal due process standard governing allegedly

improper argument by the prosecution—a prosecutor may argue both facts in

evidence and reasonable inferences from those facts.  *See Tucker v. Kemp*, 762 F.2d 1496, 1506 (11th Cir. 1985) (citations omitted).  However, if the evidence is too insubstantial to support a reasonable inference, the prosecutor's comment will be deemed improper.  *Id.* at 1507.  Prosecutors must observe the distinction between the permissible practice of arguing evidence and suggesting inferences which the jury may reasonably draw from it and the impermissible practice of arguing suggestions beyond the evidence.  *See United States v. Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992) (citation omitted).

The prosecutor is not limited to a bare recitation of the facts; he may comment on the evidence and express the conclusions he contends the jury should draw from the evidence.  *United States v. Johns*, 734 F.2d 657, 663 (11th Cir. 1984).  A prosecutor may comment on the uncontradicted or uncontroverted nature of the evidence and may point out that there is an absence of evidence on a certain issue during closing argument to the jury.  *See White v. State*, 377 So. 2d 1149, 1150 (Fla. 1980) (citations omitted).  Additionally, prosecutorial comment upon a general lack of defense evidence is permissible.  *See Smiley v. State*, 395 So. 2d 235 (Fla. 1st DCA 1981).

Attempts to bolster a witness by vouching for his or her credibility are improper "if the jury could reasonably believe that the prosecutor indicated a

personal belief in the witness' credibility." *United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir. 1991) (citing *United States v. Sims*, 719 F.2d 375, 377 (11th Cir. 1983)).  A jury could believe that the prosecutor personally believed in the witness' credibility "if the prosecutor either places the prestige of the government behind the witness, by making explicit personal assurances of the witness' veracity, or the prosecutor implicitly vouches for the witness' veracity by indicating that information not presented to the jury supports the testimony." *Id.* (citation omitted); *see also United States v. Hernandez*, 921 F.2d 1569, 1573 (11th Cir. 1991).  The prohibition against vouching does not forbid prosecutors from arguing credibility; it simply forbids the prosecutor from arguing credibility based on the reputation of the government office or on evidence not before the jury.  *Id.*  Further, when the prosecutor voices a personal opinion but indicates this belief is based on evidence in the record, the comment is not improper.  *United States v. Granville*, 716 F.2d 819, 822 (11th Cir. 1983) (finding no prosecutorial misconduct where prosecutor, in effort to support testimony of two government witnesses, only pointed to matters in evidence: the demeanor of one witness and testimony of support witnesses, as well as a tape recording corroborating the testimony of another) (citations omitted).  Likewise, a prosecutor may reply to remarks, comments or assertions made by defense counsel.  *See United States v. Young*, 470 U.S. 1, 11–13 (1985) (when

prosecutor's comments are an "invited reply" in response to defense counsel's own remarks, and he "[does] no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction") (citations omitted).

To assess whether Attorney Ruiz had a basis to object, the court must consider the comments in the context of the evidence adduced at trial and the entirety of the arguments by the prosecutor and the defense. The court will address the alleged "mischaracterization of the evidence" comment first.

The prosecutor's comment, that there was no evidence that the victim was attempting to commit a crime against Thomas when Thomas shot him, was made at the beginning of the prosecutor's first closing argument (ECF No. 21-2 at 430–33). The court had just instructed the jury, and those instructions included definitions of justifiable and excusable homicide (*id.* at 414–15). The prosecutor argued:

> I would suggest to you that this was not a—as the instruction[s] say, a justifiable or an excusable homicide.
>
> Let's go ahead and address those, because those are the lawful killings. **There is no evidence before this jury, none at all, that Steven Brown was trying to commit a crime against Jacob Thomas**, nor in any house, dwelling place where Jacob Thomas was. **There is no evidence of that.** There is no reason that Steven Brown needed to die. And no matter what the fight was about, ladies and gentlemen, I would suggest to you, you remember me talking to Dr. Clark, with all the drugs and alcohol and the beating on his head, he was out of it. He was defenseless.

Justifiable homicide does not—this was not justified. Excusable allows the killing, when it's done by accident or misfortune. I would suggest to you there is no sign. Nobody does something nine times by accident. If you—perhaps, you could drop a gun and the bullet would come off crazy. Think about what the evidence also is from the medical examiner. That barrel was literally pressed into his abdomen to such a point that we can see the front sight pressed into his skin. This was no accident. This was someone deciding to take a life.

Final form of excusable homicide talks about a sudden combat, but I would show you it specifically says, if a dangerous weapon is used, this does not apply. Clearly, a .38 or a .357 is just that. So, we have an unlawful taking of a human life. There is no lawful justification for Steven Brown laying [sic] dead in the dirt on Nashville Drive.

(ECF No. 21-2 at 432–34) (emphasis added to identify comments that Thomas contends were improper).

As previously discussed, it is proper for a prosecutor to refer to the evidence as it exists before the jury and to point out that there is an absence of evidence on a certain issue. *See White*, 377 So. 2d at 1150. That is what the prosecutor did in Thomas' case. There was no evidence presented at trial that Steve Brown was attempting to commit a crime against Thomas when Thomas shot him. The state court reasonably concluded that Attorney Ruiz was not deficient for failing to object to this comment.

With respect to the prosecutor's alleged bolstering, the comments were made during the prosecutor's last closing argument, after Attorney Ruiz's closing

argument.  Attorney Ruiz argued that Henry Isom had credibility issues, because he testified to some facts that he did not tell police when they interviewed him after the shooting (ECF No. 21-2 at 444).  In response, the prosecutor acknowledged the weaknesses with each witness' testimony (i.e., that Henry Isom was inconsistent, Sarah Abner had been drinking a lot, and Frederick Franklin's testimony varied from his prior statements) and simply argued that the jury should believe the witnesses' testimony because it was consistent with the results of the autopsy and the DNA evidence (*id.* at 448–50).  The prosecutor did not make any explicit personal assurances of any witness' veracity, nor did the prosecutor implicitly vouch for any witness' veracity by indicating that information not presented to the jury supported the witness' testimony.  Therefore, the state court reasonably concluded that Attorney Ruiz's failure to object was not deficient.

Finally, with respect to Thomas' "cumulative error" claim, the state court reasonably concluded that Thomas' failure to establish error with respect to either of the comments Thomas identified, defeated his claim that the cumulative effect of those comments deprived him of a fair trial.

Thomas has not demonstrated that the state court's adjudication of Ground Five was based upon an unreasonable determination of the facts, or that it was

contrary to or an unreasonable application of *Strickland*.  Thomas is thus not entitled

to federal habeas relief on Ground Five.

## IV.  CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States

District Courts provides that "[t]he district court must issue or deny a certificate of

appealability when it enters a final order adverse to the applicant," and if a certificate

is issued "the court must state the specific issue or issues that satisfy the showing

required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a).  A timely notice

of appeal must still be filed, even if the court issues a certificate of appealability.  28

U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has

made a 'substantial showing of the denial of a constitutional right.'"  *Miller-El v.*

*Cockrell*, 537 U.S. 322, 336 (2003) (quoting § 2253(c)(2)).  "At the COA stage, the

only question is whether the applicant has shown that 'jurists of reason could

disagree with the district court's resolution of his constitutional claims or that jurists

could conclude the issues presented are adequate to deserve encouragement to

proceed further.'"  *Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (citing *Miller-El*, 537

U.S. at 327).  The petitioner here cannot make that showing.  Therefore, the

undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of  Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 3<u>rd</u> day of February 2021.


                    /s/ *Elizabeth M. Timothy*
                    **ELIZABETH M.  TIMOTHY**
                    **CHIEF UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control</u>.  An objecting party must serve a copy of the objections on all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**